| | | |
|---|---|---|
| BARRY GLAZER<br>1010 Light Street<br>Baltimore, Maryland 21230 | * | IN THE CIRCUIT COURT |
| and | * | OF MARYLAND |
| GINA GARGEU<br>1010 Light Street<br>Baltimore, Maryland 21230 | * | FOR BALTIMORE CITY |
| *Representative Plaintiffs* | * | |
| v. | * | |
| THYSSENKRUPP ELEVATOR CORP.<br>513 Progress Drive<br>Linthicum, Maryland 21090 | * | |
| *Serve on*: The Prentice-Hall<br>Corporation System, MA<br>7 Saint Paul Street, Suite 820<br>Baltimore, Maryland 21202 | * | |
| and | * | |
| THYSSENKRUPP AG<br>thyssenkrupp Allee 1<br>45143 Essen, Germany | * | |
| *Defendants* | * | Case No.: 24-C-19-004542 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CLASS ACTION COMPLAINT

NOW COME the representative plaintiffs, Barry Glazer and Gina Gargeu, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against the Defendants, ThyssenKrupp Elevator Corporation and ThyssenKrupp AG, and in support thereof state as follows:

## THE PARTIES

### I. PLAINTIFFS

1. During the period alleged in this Class Action Complaint, the following representative plaintiffs, Gina Gargeu and Barry Glazer (*hereinafter*, the "representative plaintiffs"), were schemed by the Defendants, *inter alia,* through their fraudulent inducements to enter into a service contract providing for preventative maintenance and repair of an older elevator that was manufactured and sold by another company (*hereinafter*, the "Service Contract"), located at the representative plaintiffs' commercial real property known as 908 Washington Boulevard in Baltimore City, Maryland (*hereinafter,* the "Real Property").

2. Representative plaintiff Barry Glazer is a resident of Baltimore County, Maryland and at all times relevant hereto has been a resident of the State of Maryland.

3. Representative plaintiff Gina Gargeu is a resident of Baltimore City, Maryland and at all times relevant hereto has been a resident of the State of Maryland.

### II. DEFENDANTS

4. ThyssenKrupp Elevator Corporation is a Delaware Corporation with its principal place of business in Whittier, California. During the period set forth in this Class Action Complaint, ThyssenKrupp Elevator Corporation was engaged in the business of selling new elevators and providing elevator maintenance and repair services to customers in the United States. ThyssenKrupp Elevator Corporation is a wholly owned subsidiary of ThyssenKrupp AG with a satellite office in Linthicum, Maryland.

5. ThyssenKrupp AG is a German corporation with its principal place of business in Dusseldorf, Germany. During the period set forth in this Class Action Complaint, ThyssenKrupp AG was engaged in the business of selling elevators and providing elevator maintenance and repair services to customers around the globe, which included the United States.

6. Whenever in this Class Action Complaint reference is made to any act, deed, or transaction by or through a business entity, it means that the business entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees or other representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action pursuant to, *inter alia*, the provisions of Maryland Code, *Courts & Judicial Proceedings*, § 1-501.

8. This Court has personal jurisdiction over the Defendants pursuant to, *inter alia*, the provisions of Maryland Code, *Courts & Judicial Proceedings*, §§ 6-102 and 6-103.

9. Venue is proper in the Circuit Court of Maryland for Baltimore City pursuant to, *inter alia*, the provisions of the Maryland Code, *Courts & Judicial Proceedings*, §§ 6-201 and 6-202.

10. Representative plaintiffs' claims and the claims of the potential Class members involve matters of statewide interest, particularly in Baltimore City.

## CLASS ACTION ALLEGATIONS

11. Representative plaintiffs bring this class action on behalf of themselves and the members of the following Class:

### CLASS

All persons or entities in the State of Maryland that contracted for elevator repair and/or maintenance services with the Defendants on elevators that were at least ten years old and/or manufactured or sold by a company other than ThyssenKrupp AG or one of its subsidiaries from 2000 through the present (the "Class Period"). Excluded from the Class are the Defendants, their co-conspirators and their respective parents, subsidiaries, and affiliates.

12. Representative plaintiffs do not know the exact size of the Class since such information is exclusively in the control of Defendants. However, due to the nature of the trade and commerce involved, the representative plaintiffs believe that the Class is at least in the hundreds and are so numerous and geographically dispersed that joinder of all persons is impracticable.

13. Representative plaintiffs' claims are typical of other members of the Class who likewise were damaged by the Defendants' scheme that, *inter alia*, provided for the intentional manipulation of maintenance and repairs to older elevators and/or elevators manufactured by different companies to make them appear to be in a condition that the Defendants attempted to leverage and/or leveraged to sell costly and unnecessary upgrades or completely new elevators as set forth more fully throughout this Class Action Complaint.

14. Representative plaintiffs believe that they will fairly and adequately protect the interests of the Class. The representative plaintiffs, like the Class members, were fraudulently induced to enter into a non-cancelable service contract with the Defendants for elevator maintenance and repair services as set forth more fully throughout this Class Action Complaint and have a common and non-antagonistic interest in recovering money lost through unlawful activity and deterring future unlawful activity in the elevator services and sales market. The Law Office of Barry R. Glazer, LLC and undersigned counsel are experienced in complex litigation and are fully capable of prosecuting this class action litigation in this forum.

15. Common questions of law and fact predominate over questions pertinent to only individual Class members. Questions of law and fact common to the Class members predominate over questions, if any, that may affect only individual members because the Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in the Defendants' scheme as set forth more fully throughout this Class Action Complaint. Common questions of law and fact include, but are not necessarily limited to:

   (a) Whether the Defendants entered into service contracts with owners of older elevators and/or elevators sold and manufactured by another company with the intention of trying to thereafter sell unnecessary upgrades and/or completely new elevators;

   (b) Whether the Defendants held themselves out as being equipped with resources to maintain, diagnose, and repair the elevators they contracted to maintain, diagnose, and/or repair;

   (c) The dates that the Defendants were engaged in forming their service contracts;

  (d)  The identities of any participants in the Defendants' scheme;

  (e)  The manner and means of the execution of the Defendants' scheme;

  (f)  Whether Class members have been damaged by the Defendants' scheme, including the services they contracted for and the damages inherent in the Defendants' manipulation of safe and reliable elevator service.

  16. Class action treatment is superior to other means of prosecuting these claims as the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication. Moreover, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication, effort or expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action litigation that would preclude maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Class is readily identifiable.

  17. Defendants have acted on grounds generally applicable to the entire Class, thereby making final relief appropriate with respect to the entire Class.

**BACKGROUND ALLEGATIONS OF THE DEFENDANTS' WRONGDOING**

  18. Beginning at least as early as 2000 and continuing until the present day, the Defendants have engaged in a scheme to induce owners of older elevators and/or elevators manufactured and sold by other companies to enter into non-cancelable contracts for the maintenance and repair of their elevators, which grants the Defendants exclusive control over any inspection, diagnosis, or repairs to be performed on the elevators. Defendants induce elevator owners to agree to their irrevocable terms by holding themselves out as leaders in the elevator industry with the resources to deliver on their maintenance and repair contracts. Once the contracts with elevator owners for maintenance and repair are executed, the Defendants leverage their exclusive control over the maintenance and repair of the elevators in an attempt to get elevator owners to purchase unnecessary costly upgrades or entirely new elevators that themselves often require agreements with the Defendants to do the maintenance and repairs for an extended period of time.

  19. The industry for sales and service of elevators in the United States is characterized by economic conditions that are consistent with and conducive to the scheme alleged

herein. There are a relatively small number of companies in the industry and high barriers to entry resulting from the capital-intensive nature of the business.

20. The industry for sales and service of elevators in the United States is highly concentrated, with the top few sellers, including the Defendants, accounting for approximately 75% of the market.

21. The market for sales and service of elevators in the United States is an oligopoly: a few firms producing and selling a product and associated service. Where the Defendants' new elevator sales are concerned, the maintenance and repairs are controlled by the design of the elevators to require proprietary diagnostic and service tools that are not provided to other elevator service companies. Parts, manuals, schematic diagrams, and software for the elevators are made to be difficult or impossible for competitors to obtain, and the Defendants engage in as variety of other conduct designed to prevent competition for maintenance and repair contracts on the elevators they sell. As a result, there is no effective competition for the maintenance and service work on the new elevators the Defendants sell for several years after installation, giving the Defendants an effective monopoly on service for these new elevators.

22. As much as 60-70% of Defendants' business is the maintenance and service of elevators. To ensure elevator safety, most building owners are required by law to have an elevator maintenance and service contract. The first decade after an elevator is sold and installed is by far the most profitable period for service and maintenance since relatively little service and few replacement parts are typically required during these first years. As a result, the Defendants' sales of new elevators and control of elevator maintenance and repairs on their new elevators is their real objective. After the initial warranty period, during which the Defendants provide all maintenance and repairs on the elevators they sell, the Defendants effectively ensure that consumers will enter into long-term maintenance and repair contracts that include stiff penalties for early termination by the customer and "evergreen" clauses that provide for automatic renewal unless the customer takes action to discontinue the contract.

23. As communicated above, the Defendants prevent other companies from effectively competing to maintain and repair the new elevators they sell through a variety of exclusionary conduct. Another example of typical exclusionary conduct is the inclusion of a

proprietary elevator control system that contains embedded computer systems and software. In order to maintain or repair elevators with a proprietary elevator control system, it is necessary to perform diagnostic testing using proprietary service tools available only to the Defendants and their subsidiaries. These hand-held devices, typically with a digital read-out screen and alphanumeric keypad, have been used to test and service elevators since the late 1980's and are still widely used. These service tools are inserted directly into the elevator's controller and are necessary to set, adjust, or reconfigure the electronic parameters of the elevator and to diagnose problems with the computerized functions of the elevators. Some elevators also allow diagnostics to be done using a laptop computer upon which the appropriate software has been installed. This software is not released to customers who purchase elevators or other elevator maintenance companies.

24. As the use of embedded computer systems has increased, there has been a corresponding increase in the amount of new elevator equipment - including upgraded replacement elevator equipment of the kind and type that was often presented to the Class members as an alternative to buying entirely new elevators - which requires the use of these specialized electronic service tools that limit the building owner's choice of elevator maintenance companies for all future maintenance and repair to the Defendants and their subsidiaries. As well, the schematic diagrams for the elevators and the new elevator equipment that are sold are not released to competitors or customers, making it even more difficult for any other company to perform maintenance or repairs.

25. The only way an independent elevator maintenance and repair company can repair elevators with the modern proprietary elevator systems is to reverse engineer the necessary software and service tools, which is usually prohibitively costly and time-consuming, particularly for smaller independent elevator maintenance and repair companies which do not have the vast resources that the Defendants have. Once the consumers purchase these new elevators, the market for maintenance and repairs through the use of "secret" maintenance information effectively belongs to the seller for decades.

26. Remote Elevator Monitoring (*hereinafter*, "REM") is also a feature that is increasing being installed on new elevators and elevators that receive costly overhauls or

upgrades, which has made it even more difficult for other companies to compete for maintenance and service contracts. For example, the REM automatically transmits fault codes to the seller's office allowing them to diagnose a problem, and send a technician if necessary. The REM provides huge savings on the cost of regular visits by technicians who typically have gone from monthly visits to visiting the elevators twice a year. The REM, which is touted to the customer as a vital safety feature, is removed if the customer enters into a maintenance and service contract with any other company to dissuade the customer from inviting bidding on maintenance and contracts. The growing utilization of REMs further ties customers to using the maintenance and repair services from the Defendants.

27. The Defendants also make it difficult for other companies it obtain OEM parts needed to maintain or repair the elevators they sell to consumers. To the extent such parts are made available to competitors, these parts are sold at an inflated price and shipments are sometimes intentionally delayed in order to restrain the ability of other companies to compete for this maintenance and repair work.

28. Throughout the Class Period, the Defendants effectively, affirmatively, and fraudulently concealed from the representative plaintiffs and other Class members that new elevator purchases would effectively lock them into using the Defendants' maintenance and service contracts for decades to come and that the Defendants would be leveraging existing maintenance and repair contracts in an effort to compel the purchase of unnecessary costly upgrades and the Defendants' new elevators as set forth more fully throughout this Class Action Complaint. The representative plaintiffs and the Class members had no knowledge of the Defendants' schemes alleged in this Class Action Complaint, or any facts that might have led to the discovery thereof in the exercise of reasonable diligence

### *THYSSENKRUPP AG AND ITS SUBSIDIARIES' CARTEL HISTORY*

29. Defendant ThyssenKrupp AG and its subsidiaries' European offices were raided by the European Union Commission as part of an investigation by European Commission and antitrust investigators for participating in an international cartel to fix the price of new elevators and escalators and elevator and escalator maintenance and repair services, and to rig bidding on contracts for new elevators and escalators and elevator and escalator maintenance and repair

services in violation of antitrust laws. *See* related documents, attached hereto as Exhibit 1 and incorporated as if set forth fully herein.

30. Defendant ThyssenKrupp AG engaged in a successful, illegal scheme that by its nature was inherently self-concealing.

31. Like the aforementioned investigation by European Commission and antitrust investigators, the Defendants' wrongful conduct toward the representative plaintiffs and potential Class members as alleged in this Class Action Complaint was carried out through means and methods which were designed and intended to avoid detection and which in fact successfully precluded detection. Although the representative plaintiffs and Class members exercised due diligence throughout the Class Period, they could not have discovered the Defendants' scheme at any earlier date because of the effective, affirmative, and fraudulent concealment of the Defendants' activities as was the case in the aforementioned European investigation.

32. While the representative plaintiffs and Class members have diligently sought to protect themselves from the Defendants' scheme, they were unable to detect the scheme, which by its nature is self-concealing. Accordingly, the statute of limitations has been tolled and suspended with respect to any and all claims arising from the Defendants' scheme.

33. Defendant ThyssenKrupp AG and its subsidiaries admitted during the European cartel investigation to the same or similar scheming as is alleged in this Class Action Complaint. Moreover, these schemes are not in isolation. Defendant ThyssenKrupp AG and its subsidiaries have quite an extensive cartel history previous to and after the cartel investigation discussed above that involves the elevator industry and other industries that Defendant ThyssenKrupp AG and its subsidiaries operate in or have in the past. *See* Evidence of other Investigations into ThyssenKrupp AG and its subsidiaries, attached hereto as Exhibit 2 and incorporated as if set forth fully herein.

### ALLEGATIONS SPECIFIC TO THE REPRESENTATIVE PLAINTIFFS

34. On or about June 15, 2015, the representative plaintiffs purchased the Real Property.

35. The Real Property is serviced by an elevator located adjacent to the front lobby/ reception area that was not in operation at the time the representative plaintiffs purchased the Real Property.

36.     Prior to the representative plaintiffs' purchase of the Real Property, the maintenance and repairs to their elevator were performed bu the Defendants.

37.     Subsequent to their purchase of the Real Property, the representative plaintiffs contacted the Defendants about inspecting their elevator to ascertain what it would take to make their elevator operational and certified as compliant with relevant safety laws. It was at this time that the Defendants expressly orally communicated to the representative plaintiffs and presented them with a service contract for maintenance and repairs to the elevator that addressed the Defendants' ability to maintain and repair the elevator. *See* Representative Plaintiff's Service Contract, attached hereto as Exhibit B and incorporated as if set forth fully herein. The express language in the attached service contract communicates the same inducements that were orally communicated to the representative plaintiffs by the Defendants as part of their scheme and that the Defendants induced the potential Class members with as part of their scheme to defraud them.

38.     The representative plaintiffs elected at this time not to enter into a service contract with the Defendants. Thereafter, on March 29, 2017, the Defendants charged the representative plaintiffs $3,648.36 to get their elevator operational and certified as compliant with relevant safety laws. Nevertheless, the elevator still was not operational nor was it compliant with relevant safety laws.

39.     On June 29, 2017, the Defendants insisted that the representative plaintiffs replace a power supply for $345.00. Nevertheless, the elevator still was not operational nor was it compliant with relevant safety laws.

40.     On December 28, 2017, the Defendants insisted that the representative plaintiffs have smoke testing done at a cost of $1,183. Nevertheless, the elevator still was not operational nor was it compliant with relevant safety laws.

41.     On March 20, 2018, the Defendants insisted that the representative plaintiffs have a phone installed in the elevator at a cost of $1,183.00. Nevertheless, the elevator still was not operational nor was it compliant with relevant safety laws.

42.     On April 26, 2018, the Defendants insisted that the representative plaintiffs have work done on the smoke detectors at a cost of $2,183.28. Nevertheless, the elevator still was not operational nor was it compliant with relevant safety laws.

43. The above costly repairs notwithstanding, which the Defendants expressly communicated to the representative plaintiffs would have been covered under the service contract and were expressly represented by the Defendants to be covered under the service contract after November 8, 2017, when the representative plaintiffs executed the Defendants' service contract, the representative plaintiffs' elevator was not repaired and operational until they brought in an outside company to diagnose and repair what was nothing more than a minor issue that the Defendants conflated in an effort to get the representative plaintiffs to make unnecessary and costly upgrades to their elevator or to purchase an entirely new elevator from the Defendants.

44. As communicated above, in furtherance of their fraudulent scheme the Defendants induced consumers, including the representative plaintiffs and the potential Class members, prior to the execution of any service contracts with express material misrepresentations about the quality of their maintenance and repair services. These representations by the Defendants were the same as or materially similar to the following express representations found in the representative plaintiffs' service contract:

45. After the Defendants fraudulently induced consumers to enter into service

**Quality Assurance**
To help increase elevator performance and decrease downtime, our technicians utilize the latest industry methods and technology available to us for your specific brand of elevator. They will be equipped with our tools, documentation and knowledge to troubleshoot your unique system, as well as access to a comprehensive parts replacement inventory system.

Behind our technicians is a team devoted to elevator excellence. Technicians are supported around the clock by a team of engineers and field support experts. Our North American technical support facilities continuously research advancements in the industry and in your equipment. Also, our internal quality control program ensures optimum and reliable operation of your elevator equipment.

To assure that quality standards are being maintained, we may conduct periodic field quality audit surveys. Your

dedicated ThyssenKrupp Elevator representative will be available to discuss your elevator needs with you in all aspects of service and modernization. In addition, you may receive recommendations for upgrades that will also provide you with budget options designed to enhance the appearance, performance and safety of or meet Code requirements for your equipment over time.

contracts, including the representative plaintiffs and potential Class members, by assuaging any concerns that they might not have the ability to maintain and repair their elevators, they imposed a contractual clause whereby they retained exclusive control over all inspections, recommendations,

and work that was done to the elevators to keep them operational and in compliance with applicable safety laws. Further, the same contractual clause requires that the owner of the elevator accept the Defendants' judgment as to what maintenance and repairs need to be done to the elevators. The contractual clause in the representative plaintiffs' service contract discussed directly above provides as follows:



> **Other**
> You agree not to permit others to make alterations, additions, adjustments, or repairs or replace any component or part of the equipment during the term of this agreement. You agree to accept our judgment as to the means and methods employed by us for any corrective work under this agreement.

46. The Defendants' service contract also could not be canceled pursuant to a non-cancelation clause.

47. Overwhelmed with the cost of repairs to an elevator that was still not in service or compliant with applicable safety laws and in reliance on the Defendants' express representations that they were ready, willing, and able to bring the representative plaintiffs' elevator into service, compliant with applicable safety laws, and to provide the maintenance and repairs on the elevator thereafter, as communicated above, the representative plaintiffs entered into the Defendants' service contract on November 8, 2017, at a cost of $220.00 a month, which to date is still being charged.

48. However, rather than bringing the representative plaintiff's elevator into service and making it compliant with applicable safety laws, the Defendants delayed maintenance, claimed ignorance of the operation of the elevator, and attempted to charge astronomical fees for their experts to troubleshoot the elevator, which was covered and included in the service contract, while the Defendants all the while were pitching the sale of unnecessary costly upgrades and a new elevator.

49. The representative plaintiffs eventually wised up to the Defendants' refusal to bring their elevator into service and compliant with applicable safety laws in favor of pitching the sale of costly unnecessary upgrades and a new elevator. As communicated above, the representative plaintiffs had a different elevator repair company come out and diagnose why their elevator still

had not been brought into service and why it was not in compliance with applicable safety laws. This new elevator repair company diagnosed the issue with the elevator, which was brought into service in compliance with applicable safety laws almost immediately.

50. At all times relevant to this Class Action Complaint, the Defendants could have diagnosed the minor issue keeping the representative plaintiffs' elevator out of service and brought their elevator into compliance with relevant safety laws, but instead leveraged additional mounting charges and the representative plaintiffs' out of service elevator in an effort to get the representative plaintiffs to make costly unnecessary upgrades or purchase a new elevator that the Defendants would effectively have the maintenance and repair contract on for the next few decades.

51. Adding insult to the representative plaintiffs' injuries and as was also the case with the potential Class members' service agreements, the Defendants enforced a provision of the service contract that provides that the contract cannot be canceled until the expiration of the contractual period, which is particularly unconscionable in cases such as the representative plaintiffs and many of the potential Class members that have tenants complaining about elevators, the operation of which the Defendants' have frustrated in furtherance of their scheme.

## CAUSE OF ACTION
## FRAUD - DECEIT

52. Representative plaintiffs repeat and reallege each of the foregoing paragraphs of this Class Action Complaint as if set forth in full.

53. Defendants asserted false representations of a material fact to the representative plaintiffs and Class members when they held themselves out as having the resources, ability, and desire to maintain and repair their elevators as set forth more fully above.

54. Defendants knew that these representations were false or that the representations were made with such reckless disregard for the truth that knowledge of their falsity can be imputed to the Defendants.

55. Defendants made the false representations for the purpose of defrauding the representative plaintiffs and Class members.

56. Representative plaintiffs and class members relied with justification upon the Defendants' misrepresentations as set forth more fully above.

57. Representative plaintiffs and Class members suffered damages as a direct result of their reliance upon the Defendants' misrepresentations consistent with the Defendants' failures to maintain their elevators or to timely diagnose and repair their elevators, which had the unnecessary potential to or did put the elevators out of service for an unreasonable amount of time. As well, in many instances, the representative plaintiffs and Class members have had to pay the Defendants unnecessary fees for services and/or employ outside companies to make repairs to their elevators that the Defendants were required to timely diagnose and repair pursuant to the service contracts.

## PRAYER FOR RELIEF

WHEREFORE, the representative plaintiffs on behalf of themselves and all other similarly situated respectfully request:

A. That the Court certify a class pursuant to the Maryland Rules of Civil Procedure;

B. That the representative plaintiffs and the Class recover compensatory and punitive damages against each defendant, jointly and severally;

C. That the representative plaintiffs and the Class be awarded their expenses and costs of suit including reasonable attorneys' fees to the highest extent provided by law;

D. That the representative plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the highest extent provided by law; and

E. That the representative plaintiffs and the Class be awarded such additional further relief as the Court may deem proper.

Respectfully submitted,

Charles H. Edwards IV
1010 Light Street
Baltimore, Maryland 21230
Phone: (410) 547-8568
Fax: (410) 547-0036
charles.edwards@robinhoodlawyers.com

*[signature]*

Barry R. Glazer
1010 Light Street
Baltimore, Maryland 21230
Phone: (410) 547-8568
Fax:   (410) 547-0036
barryrglazer@yahoo.com